# COURT OF APPEALS OF VIRGINIA

**Record No. 0510-25-4**

CORESITE, LLC, ET AL.
v.
COUNTY OF FAIRFAX, VIRGINIA

Present: Judges Friedman, Chaney and Duffan

Argued at Fredericksburg, Virginia

Opinion Issued June 16, 2026

**FROM THE CIRCUIT COURT OF FAIRFAX COUNTY**
Susan J. Stoney, Judge

Matthew N. Leerberg (Doug P. Hibshman; Dana Molinari; Fox Rothschild LLP, on briefs), for appellants.

Martin R. Desjardins, Assistant County Attorney (Elizabeth D. Teare, County Attorney; Corinne N. Lockett, Deputy County Attorney; Daniel Robinson, Senior Assistant County Attorney; Office of the Fairfax County Attorney, on brief), for appellee.

**PUBLISHED OPINION BY**
**<u>JUDGE KEVIN M. DUFFAN</u>**

This appeal asks us to determine whether Fairfax County (the County) may require CoreSite, LLC, a data center company, to provide customer names to verify that those customers are paying taxes on customer-owned equipment stored in CoreSite's data centers. Code §§ 58.1-3109(6) and -3110, as well as the data center's customer agreements, give the County authority to obtain certain information from CoreSite. The County, however, failed to "specifically identif[y]" taxpayers in its January 2024 summons under Code § 58.1-3110, so that summons cannot be enforced as issued. Accordingly, we affirm in part, reverse in part, and remand.

BACKGROUND

The facts are not in dispute. CoreSite is a data center company that owns and operates four data centers in Reston, Virginia. From these data centers, CoreSite provides roughly 300 customers with the ability to access servers and cloud storage directly at the data center. CoreSite also leases space in its data centers for some customers to store and use their own equipment. This business model is facilitated through customer agreements that govern the relationship between CoreSite and its customers. These customer agreements have a confidentiality provision in which CoreSite agrees to keep the parties and terms of the agreement confidential. The provision, however, contains a carveout that allows CoreSite to "provide any information as required to any receiver or governmental or quasi-governmental entity, or to any person or entity with a valid court order."

During an earlier lawsuit, the County discovered that "many entities . . . rent space and put equipment in CoreSite's building[s]." As a result, in September 2021, the County contacted CoreSite to investigate the tax implications of tangible personal property at its data centers. The County requested "a complete and accurate listing of all current tenants at [the data centers] as of January 1, 2021." The County cited Code § 58.1-3901 as giving it the power to "require[] every person owning or operating any office building, office suite, apartment building, house or land" in the county to provide "a list of the names and addresses of every current tenant" and noted that "all information furnished under [the] request [would be] confidential" under Code § 58.1-3.

In May 2022, the County again requested that CoreSite "provide a complete and accurate listing of all current tenants" at the data centers. This time the County cited Code § 58.1-3109(6) instead of Code § 58.1-3901. In its request, the County noted that Code § 58.1-3109(6)

"mandates that [it] require taxpayers to furnish books of account, records, and information on personal property, income, and license taxes for 'any and all taxpayers.'"[1]

Two months later, in July 2022, CoreSite responded. In its response, CoreSite explained that it was "substantially concerned" about "the nature and scope of the County's request." CoreSite added that the "County fail[ed] to address whether any of CoreSite's [c]ustomers [were] actual Virginia or County 'taxpayers' responsible for paying the taxes addressed in the [May 2022 letter], or to specifically identify such taxpayers." Because CoreSite did not know if the "vast majority" of its customers were Virginia or County taxpayers, it argued that the County's request shifted the investigative burden on CoreSite to determine which of its customers were "actual Virginia or County taxpayers." CoreSite maintained that the County's letter requested information about non-Virginia taxpayers and thus was "inconsistent" with the cited authorities. To that end, CoreSite explained that Code § 58.1-3109(6) "only permits the County to request information regarding actual Virginia or County 'taxpayers.'" CoreSite also contended that it would be "incredibly burdensome and costly for CoreSite" to comply and investigate which customers were taxpayers. CoreSite concluded by highlighting that its customer information is confidential and therefore disclosing the information "without a valid legal basis" would subject CoreSite to "substantial contractual / legal liability from its [c]ustomers."

Following CoreSite's response, the two parties exchanged letters for over a year. In those letters, the County asserted its authority to request and receive information under Code

---

[1] Code § 58.1-1: "'Taxpayer' includes every person, corporation, partnership, organization, trust or estate subject to taxation under the laws of this Commonwealth, or under the ordinances, resolutions or orders of any county, city, town or other political subdivision of this Commonwealth."

§ 58.1-3109(6), but CoreSite still refused to provide information—citing a disagreement in interpreting the statutes.

In January 2024, the County summoned CoreSite under Code § 58.1-3110.  The County noted that CoreSite would be required to appear before it to "answer under oath questions, and provide information and records."  The County requested the following:

> A complete and accurate listing of all current tenants, and/or individuals or entities otherwise leasing, contracting, or using space or receiving services anywhere inside the buildings or other improvements ("CoreSite Customers"), and copies of all related leases or service contracts for all CoreSite Customers, at [the data centers].

CoreSite responded by acknowledging receipt and noted that it "respectfully disagree[d] with the County's position and asserted authority to request such documentation and information from CoreSite."  Later in its response, CoreSite argued that (1) the County sought information and documents on entities that were not Virginia taxpayers; (2) it was infeasible for CoreSite to determine its customers' tax status; and (3) the County failed to specifically identify any CoreSite customers in the summons, as it was required to do under Code § 58.1-3110.  CoreSite did, however, offer to provide redacted customer agreements.

CoreSite filed a petition for a declaratory judgment under Code § 8.01-184 and a motion to quash the summons in the Fairfax County Circuit Court.  Noting that there was no dispute of fact, both parties moved for summary judgment.  At the summary judgment hearing, CoreSite argued that the County overstepped its authority and had no basis to request CoreSite's customer information.  CoreSite's argument rested on three propositions: (1) the County could request information only pertaining to "taxpayers"; (2) the County did not meet the requirements of Code § 58.1-3110, because it failed to identify any taxpayer; and (3) CoreSite's customer agreements bar it from giving the County information "even if [it] wanted to."

In response, the County argued that it had the statutory authority to "seek records and information about taxpayers unknown to it." The County contended that the plain language of Code §§ 58.1-3109(6) and -3110 grant it "broad authority" to obtain information to "properly assess tangible property" and that while "[n]ot everybody" would be a taxpayer, it needed to "discover[] who those taxpayers are" to make a complete assessment. The County asserted that, regardless of the statutory interpretation issues, it nonetheless specifically identified the customers in the summons. The County maintained that even if the statutes were ambiguous, the circuit court was required to view the statute through a framework granting localities broad powers to acquire information. The County also argued that CoreSite was reading a naming requirement into Code § 58.1-3110.

In its final order, the circuit court ruled in favor of the County. The circuit court first determined that Code § 58.1-3109(6) grants the County "broad authority" to gather the information needed to "properly and accurately assess taxable tangible personal property." Then it held that "Code § 58.1-3110, in requiring information concerning 'specifically identified taxpayers' [did] not require the County to identify taxpayers by name, but instead to provide sufficient specificity to allow Core[S]ite to comply with the summons." The circuit court concluded by noting Code § 58.1-3 addressed CoreSite's confidentiality concerns and that the customers agreements also provided an exception for "any information as required to any receiver or governmental or quasi-governmental entity, or to any person or entity with a valid court order." This appeal followed.

ANALYSIS

We are presented with three issues on appeal. The first is whether Code §§ 58.1-3109(6) and -3110 are broad enough to allow the County to investigate possible taxpayers to determine ownership. The second is whether the County failed to "specifically identif[y]" taxpayers, as

- 5 -

Code § 58.1-3110 requires. The third is whether the confidentiality provision in the customer agreement bars CoreSite from disclosing customer information despite the carveout. As the first two questions involve interrelated statutory construction arguments, we introduce the settled principles together and then analyze each question in turn.

I. Statutory Interpretation

This Court reviews "the trial court's grant of summary judgment de novo. We also review a trial court's construction of statutory provisions de novo." *Heald v. Rappahannock Elec. Coop.*, 80 Va. App. 53, 67-68 (2024) (quoting *VACORP v. Young*, 298 Va. 490, 494 (2020)). When interpreting a statute, our role is "to effectuate the intent of the legislature as expressed by the plain meaning of the words used in the statute," and therefore, the plain language controls, "unless the words are ambiguous or such application would render the law internally inconsistent or incapable of operation." *Chesapeake Hosp. Auth. v. State Health Comm'r*, 301 Va. 82, 95 (2022) (quoting *Llewellyn v. White*, 297 Va. 588, 595 (2019)).

A statute is ambiguous only "if the text can be understood in more than one way or refers to two or more things simultaneously or when the language is difficult to comprehend, is of doubtful import, or lacks clearness or definiteness." *Eberhardt v. Fairfax Cnty. Emps.' Ret. Sys. Bd. of Trs.*, 283 Va. 190, 196 (2012) (quoting *Covel v. Town of Vienna*, 280 Va. 151, 158 (2010)). If the words of a statute are clear and unambiguous, we do not rely on rules of statutory construction. *Id.* at 194. If, however, a statute is ambiguous, we may "consider other factors such as the purpose, reason, . . . spirit of the law, including any legislative history," and the canons of construction. *Eley v. Commonwealth*, 70 Va. App. 158, 164 (2019).

To interpret a statute, we do not "singl[e] out a particular phrase." *Va. Elec. & Power Co. v. Bd. of Cnty. Supervisors*, 226 Va. 382, 387-88 (1983) (quoting *Va. Elec. & Power Co. v. Citizens for Safe Power*, 222 Va. 866, 869 (1981)). This is because it is a court's "duty to

interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal." *Chaffins v. Atl. Coast Pipeline, LLC*, 293 Va. 564, 568 (2017) (quoting *Eberhardt*, 283 Va. at 194-95). At the same time, we are barred from modifying the meaning of a statute under the guise of interpretation because "[w]here the General Assembly has expressed its intent in clear and unequivocal terms, it is not the province of the judiciary to add words to the statute or alter its plain meaning." *Jackson v. Fid. & Deposit Co.*, 269 Va. 303, 313 (2005).

Relevant to this case are the statutes that delineate the scope of a county's taxing power. Code § 58.1-1 defines a taxpayer broadly. Indeed, "every person, corporation, partnership, organization, trust or estate subject to taxation under the laws of this Commonwealth, or under the ordinances, resolutions or orders of any county, city, town or other political subdivision of this Commonwealth," is a taxpayer. Code § 58.1-1. Code § 58.1-3109(6) mandates that commissioners of revenue:

> [r]equire taxpayers or their agents or any person, firm or officer of a company or corporation to furnish information relating to tangible or intangible personal property, income or license taxes of any and all taxpayers; and require such persons to furnish access to books of account or other papers and records for the purpose of verifying the tax returns of such taxpayers and procuring the information necessary to make a complete assessment of any taxpayer's tangible and intangible personal property, and license taxes for the current tax year and the three preceding tax years.

Code § 58.1-3109(6). On the other hand, Code § 58.1-3110 is permissive, and it authorizes a commissioner to "summon the taxpayer or any other person to appear before him at his office, to answer, under oath, questions touching the tax liability of any and all specifically identified taxpayers and to produce documents relating to such tax liability, either or both" as long as the summons is "for the purpose of assessing all taxes assessable by his office." Code § 58.1-3110.

Of particular note is the history of Code § 58.1-3110. Before 1986, the statute did not use the "specifically identified" language. Instead, the older version of the statute allowed

- 7 -

commissioners to summon anyone to answer "questions touching the tax liability of any and all taxpayers."  Code § 58.1-3110 (1984).  In 1986, the General Assembly amended the statute and added the modifier "specifically identified" to "taxpayers."  Code § 58.1-3110 (Supp. 1986).

Beyond the statutes, two Attorney General advisory opinions also inform our analysis and address the scope of Code §§ 58.1-3109(6) and -3110.  At the outset, we note that although these advisory opinions are not binding, they are nevertheless "entitled to due consideration." *Beck v. Shelton*, 267 Va. 482, 492 (2004) (quoting *Twietmeyer v. City of Hampton*, 255 Va. 387, 393 (1998)).  The weight we give an Attorney General's advisory opinion depends, in part, on whether the General Assembly has acquiesced to the Attorney General's opinion. *Id.*  This occurs when the "General Assembly has known of the Attorney General's Opinion . . . and has done nothing to change it." *Id.*  The longer the General Assembly knows of the opinion, but declines to respond to it, the stronger the indication that the opinion reflects the intent of the General Assembly. *See Matheson v. Commonwealth*, 86 Va. App. 201, 211-12 (2025) (reasoning that because the Supreme Court of Virginia found 5 years sufficient to reflect the General Assembly's acquiescence, 12 years of inaction was a stronger indication of acquiescence).  This is especially so because the General Assembly is "presumed to have had knowledge of the Attorney General's interpretation of the statutes, and its failure to make corrective amendments evinces legislative acquiescence in the Attorney General's view." *Beck*, 267 Va. at 492 (quoting *Browning-Ferris, Inc. v. Commonwealth*, 225 Va. 157, 161-62 (1983)).

The first advisory opinion applicable here is from 2003.  In it the Attorney General responded to a commissioner's request to determine whether Code § 55-248.9:1 barred landlords, or the managing agents of an apartment complex, from providing the commissioner with a list of tenants and tenant vehicle information, without the tenants' prior consent.  2003 Op. Va. Att'y Gen. 150, 150.  The Attorney General opined that Code §§ 58.1-3109(6)

- 8 -

and -3110 allowed the commissioner to acquire the list and vehicle information. *Id.* at 151-52. The Attorney General explained that "[Code §] 58.1-3901 clearly provides that a landlord must provide a tenant list to the commissioner" because "the information possessed by a landlord regarding a tenant's vehicle is 'information necessary to make a complete assessment of any taxpayer's tangible . . . personal property.'" *Id.* at 151 (alteration in original) (quoting Code § 58.1-3109(6)). The Attorney General added that Code § 58.1-3109(6) "requires 'any *person*' to furnish the commissioner with the information necessary to properly assess tangible personal property," *id.*, for the purpose of "empower[ing] a commissioner with the ability to obtain the information necessary to properly assess tangible personal property," *id.* at 152.

The 2003 advisory opinion similarly concluded that, because Code § 58.1-3110 allows a commissioner to "summon the taxpayer or *any other person* to appear . . . , to answer, under oath, questions touching the tax liability of any and all specifically identified taxpayers," a commissioner could "summon the landlord or managing agent, if necessary, to answer questions to clarify the tax liability of a specific tenant, including vehicle information." *Id.* at 151 (alteration in original). The Attorney General then explained that "[t]enants who [were] on a list provided to the commissioner by an apartment building owner or operator were 'specifically identified taxpayers' [under Code] § 58.1-3110." *Id.*

Years later, in a 2016 advisory opinion, the Attorney General responded to a commissioner's request to determine whether public utilities were exempt from providing information requested under Code § 58.1-3109(6) as it related to contractors that may be subject to a local business license ordinance. 2016 Op. Va. Att'y Gen. 302, 302. The Attorney General determined that a commissioner may request information even though "[o]ne could argue that a contractor does not constitute a 'taxpayer' over which a commissioner has authority for the purposes of §§ 58.1-3109(6) and 58.1-3110(A) unless the contractor is actually subject to a local

business license ordinance and therefore liable for local business license taxes." *Id.* at 305. This is because Code § 58.1-3109(6) "enables [commissioners] to obtain 'the information necessary to make a complete assessment of any taxpayer's . . . license taxes.'" *Id.* (alteration in original) (quoting Code § 58.1-3109(6)). To arrive at this conclusion, the Attorney General reasoned that "[a]scertaining whether a contractor is subject to a business license ordinance is necessary in order to make a 'complete assessment' of license taxes." *Id.*

A. Investigatory power over entities with unknown taxpayer status

In its first assignment of error, CoreSite argues that the County is barred from ascertaining information of its customers whose taxpayer status is unknown. We disagree. Code § 58.1-3109(6)'s mandate that commissioners "make a complete assessment of any taxpayer's" personal property is sufficiently broad to allow the County to investigate personal property in the data centers. To make a "complete assessment" the County may "[r]equire" anyone "to furnish information relating to tangible or intangible personal property . . . of any and all taxpayers." Code § 58.1-3109(6). This necessarily includes information that assists in determining ownership and whether an entity is subject to taxation.

CoreSite reads "any and all taxpayers" to limit the commissioner's authority to entities already known to be subject to Fairfax County taxes and thus to exclude customers whose status is uncertain. Code § 58.1-3109(6). That reading cannot be squared with the surrounding text. Code § 58.1-3109(6) speaks in terms of "procuring the information necessary to make a complete assessment of any taxpayer's tangible and intangible personal property" and expressly authorizes the commissioner to require "any person, firm or officer of a company or corporation" to furnish that information. Code § 58.1-3109(6). To make a complete assessment, the commissioner must be able to determine who owns the property located in the county and whether that owner meets the statutory definition of a "taxpayer" in Code § 58.1-1. Limiting the

commissioner's requests to entities whose tax status is already known would deprive that language of practical effect. It is true that an entity's tax status is binary, it is either "subject to taxation under the laws of this Commonwealth" or it is not, but the County must determine the status. *See* Code §§ 58.1-1, -3109(6). In other words, personal property exists throughout Fairfax County, and the County must determine whether the property is taxable using the tools the General Assembly provides. In this instance, the General Assembly provided a powerful tool: the power to compel an entity to "furnish information relating to tangible or intangible personal property . . . of any and all taxpayers." Code § 58.1-3109(6).

Both of the previously mentioned Attorney General's opinions support this interpretation. The 2003 advisory opinion noted that "the information possessed by a landlord regarding a tenant's vehicle is 'information necessary to make a complete assessment of any taxpayer's tangible . . . personal property.'" 2003 Op. Va. Att'y Gen. at 151 (alteration in original) (quoting Code § 58.1-3109(6)). The same analysis applies here. CoreSite's knowledge of which customers have personal property at the data centers, as well as their customer records, constitutes "information necessary to make a complete assessment of any taxpayer's tangible . . . personal property." *Id.* (alteration in original).

The 2016 Attorney General opinion, for its part, expressly raises—and dispels— CoreSite's argument. The Attorney General noted that while "[o]ne could" contend that an entity "does not constitute a 'taxpayer' over which a commissioner has authority for the purposes of §§ 58.1-3109(6) and 58.1-3110(A) unless the [entity] is *actually* subject to [a tax]," the language in Code § 58.1-3109(6) foils the argument. 2016 Op. Va. Att'y Gen. at 305 (emphasis added). This is because "[a]scertaining whether [an entity] is subject to a [personal property tax] is necessary . . . to make a 'complete assessment' of [personal property]." *Id.* The mandate in

Code § 58.1-3109(6) to make a "complete assessment" is simply too broad for CoreSite's argument to stand.

We are not bound by advisory opinions, but we give the advisory opinions "due consideration." *Beck*, 267 Va. at 492. CoreSite correctly notes that the facts of the advisory opinions are different from the facts here, but, as CoreSite acknowledges, this case presents an issue of first impression. The advisory opinions, then, are one of the few sources that examine the scope of a local taxing authority's investigative power under the statutes. Even though the opinions are not binding, we find them persuasive.

The advisory opinions' persuasiveness is bolstered by the General Assembly's apparent acquiescence to the Attorney General's interpretation of the scope of a commissioner's power to investigate entities with an unknown tax status. Comparable periods of legislative silence, in the face of a known Attorney General construction, have been held sufficient to suggest legislative acquiescence. See *Beck*, 267 Va. at 492 (five years); *Matheson*, 86 Va. App. at 211-12 (twelve years). Here, the General Assembly has not altered the scope of Code § 58.1-3109 in any way relevant to this case in the years since the 2003 and 2016 opinions.[2] This period of inaction does not by itself resolve the issue before us, but it does provide some confirmation that the Attorney General's broad reading of Code §§ 58.1-3109(6) and -3110 is consistent with the legislature's understanding. Accordingly, we find the use of "taxpayers" in Code §§ 58.1-1, -3109(6), and -3110 does not bar the County from investigating entities with an unknown tax status when it is determining ownership of taxable personal property.

### B. Specifically identified taxpayers

In its second assignment of error, CoreSite asserts that the County failed to "specifically identif[y] taxpayers" in the summons as required by Code § 58.1-3110. We agree.

---

[2] There were minor additions not relevant here.

- 12 -

Code § 58.1-3110 allows a commissioner to "summon the taxpayer or any other person to appear before him at his office, to answer, under oath, questions touching the tax liability of any and all specifically identified taxpayers and to produce documents relating to such tax liability, either or both." Code § 58.1-3110. The threshold issue here is whether the term "specifically identified" is ambiguous. As stated earlier, "[a] statute is ambiguous if 'the text can be understood in more than one way or refers to two or more things simultaneously [or] [if] the language is difficult to comprehend, is of doubtful import, or lacks clearness or definiteness.'" *Eley*, 70 Va. App. at 164 (second and third alterations in original) (quoting *Blake v. Commonwealth*, 288 Va. 375, 381 (2014)). When a statute is ambiguous, the Court may "consider other factors such as the purpose, reason, . . . spirit of the law, including any legislative history," and the canons of construction. *Id.*

Among the canons of construction is the surplusage canon. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012). This canon reflects a well-defined principle in Virginia: courts "ordinarily resist a construction of a statute that would render part of a statute superfluous." *Loch Levan Land Ltd. P'ship v. Bd. of Supervisors*, 297 Va. 674, 685 (2019) (quoting *Davis v. MKR Dev., LLC*, 295 Va. 488, 494 (2018)). This is because Virginia courts "must assume that in enacting legislation, 'the [General Assembly] did not intend to do a vain and useless thing.'" *Va. Elec. & Power Co. v. State Corp. Comm'n*, 300 Va. 153, 164 (2021) (alteration in original) (quoting *Williams v. Commonwealth*, 190 Va. 280, 293 (1949)).

When the General Assembly has not defined a term, courts turn to the "'ordinary meaning'" of the words taken "in light of 'the context in which [they are] used.'" *Eley*, 70 Va. App. at 165 (alteration in original) (quoting *Va. Marine Res. Comm'n v. Chincoteague Inn*,

287 Va. 371, 384 (2014)).  To determine the ordinary meaning of the words, Virginia courts turn to "dictionary definitions."  *Id.*

At issue here is the term "specifically identified," which the statute does not define.  The term "identified" has a relatively universal definition.  *Identify*, *Webster's Third New International Dictionary* 1123 (2002) (defining "identify" as meaning "to establish the identity of"); *Identify*, *Black's Law Dictionary* (12th ed. 2024) (defining identify as "prov[ing] the identity of (a person or thing)").  The term "specifically" is not as universally defined.  Some definitions emphasize precision and definiteness—but do not require naming an entity or thing.  *Specifically*, *Webster's Third New International Dictionary*, *supra*, at 2187 (defining "specifically" as "with exactness and precision: in a definite manner").  Other definitions require naming an entity or thing.  *Specifically*, *Black's Law Dictionary*, *supra* (defining "specifically" as meaning "[o]f, relating to, or involving a particular named thing").  In addition to these dictionary definitions, the circuit court understood "specifically identified" to require only that the County provide CoreSite with "sufficient specificity to allow [it] to comply with the summons."

That leaves three possible definitions: (1) using precision and exactness but not necessarily naming an entity or thing, (2) naming an entity or thing, or (3) using enough specificity to comply with the summons but leaving the possible requirement of naming of an entity or thing undefined.  Thus, the term "specifically identified" is ambiguous because it "can be understood in more than one way."  *Eley*, 70 Va. App. at 164.  Under the *Webster's* definition, the summons complies with the statute's requirements if the County identified taxpayers "with exactness and precision," which the County did not do.  Under the *Black's Law* definition, the County must identify the taxpayer with "a particular name[]," which the County did not do.  And under the circuit court's definition, the summons complied with Code § 58.1-3110 because the

County provided "sufficient specificity to allow Core[S]ite to comply with the summons."  The result of this case, then, hinges on which definition we use.  Determining which definition we use depends on the General Assembly's intent.  We ascertain intent by applying the canons of construction and examining the statute's history.  *Eley*, 70 Va. App. at 164.

At the outset, the surplusage canon dictates that the General Assembly intended a narrower construction than the one used by the circuit court.  Providing "sufficient specificity to allow Core[S]ite to comply with the summons" is not the same as identifying taxpayers with exactness and precision or identifying taxpayers with a particular name.  The circuit court's definition—at most—requires the County identify taxpayers or groups of taxpayers, and essentially reads "specifically" out of the statute.  However, Code § 58.1-3110 requires that the County specifically identify taxpayers, not just identify them.

If we do not accept the circuit court's interpretation of "specifically identif[y]" as correct, the analysis turns to which of the two dictionary definitions the General Assembly intended.  But we need not reach that question because, regardless of the definition, the County failed to comply with the statute.  We therefore do not decide whether Code § 58.1-3110 always requires a summons to name taxpayers or whether a sufficiently precise description that uniquely identifies the taxpayers would satisfy the statute in a different case.  It is enough to hold here that a summons directed at broad categories, such as "all current tenants" or all persons "leasing, contracting, or using space or receiving services anywhere inside the buildings or other improvements," does not "specifically identif[y]" taxpayers within the meaning of the statute. Code § 58.1-3110.

The County requested lists of "all current tenants," "entities otherwise leasing, contracting, or using space or receiving services anywhere inside the buildings or other improvements," and "copies of all related leases or service contracts for all Core[S]ite

- 15 -

[c]ustomers [at the data centers]." While these groups certainly *may* contain taxpayers, the County did not specifically identify any of them. First, the County did not name any taxpayers— a defect the County itself recognizes when it argues that the statute does not require naming an entity. Second, even under the less strict definition requiring precision and exactness, the County still falls short because—at most—it identified *groups* that may include taxpayers but not any of the taxpayers themselves. The statute requires more. *See* Code § 58.1-3110(A) (allowing commissioners to ask "questions touching the tax liability of any and all specifically identified taxpayers").

To that end, the 1986 amendment bolsters the argument that identifying groups of taxpayers is insufficient. As explained earlier, the statute initially allowed commissioners to summon anyone and require answers to questions "touching the tax liability of any and all taxpayers." Code § 58.1-3110 (1984). This language mirrors the broad language in Code § 58.1-3109(6) (authorizing commissioners to request "information relating to [the] taxes of any and all taxpayers"). Under this pre-amendment language, it seems that the County's request would have been sufficient because it identified groups of taxpayers and requested their information, but the General Assembly amended Code § 58.1-3110 in 1986. This amendment limited an inquiry's scope by requiring that any questions asked or records requested touch the tax liability of "any and all specifically identified taxpayers." Code § 58.1-3110 (Supp. 1986). A contrary interpretation would render the amendment useless and contradict the presumption that "when current and prior versions of a statute are at issue," the amendment was "intended to effect a substantive change in the law." *Va. Ret. Sys. v. Blair*, 64 Va. App. 756, 764 (2015) (quoting *W. Lewinsville Heights Citizens Ass'n v. Bd. of Supervisors*, 270 Va. 259, 265 (2005)).

Despite the dictionary definitions of "specifically" and Code § 58.1-3110's history, the County asserts that Code § 58.1-3110 must be constructed broadly because of the broad statutory

framework that includes Code § 58.1-3110. While we agree that the County has broad investigatory power in other contexts—like under Code § 58.1-3109(6)—our interpretation of this statute can only be as broad as the words the General Assembly chose. *See Verizon Va. LLC v. State Corp. Comm'n*, 302 Va. 467, 478 (2023) (noting that courts may not expand the statute's meaning just because similar policy rationales apply).

While the County makes thoughtful policy arguments for broad investigatory power extending to Code § 58.1-3110, these arguments are best addressed by the General Assembly— "the author of public policy." *In re Woodley*, 290 Va. 482, 490 (2015) (quoting *Campbell v. Commonwealth*, 246 Va. 174, 184 n.8 (1993)). As a result, our interpretation of a statute does not consider—much less depend on—the policy implications and outcomes that flow from the words the General Assembly has chosen. *Groundworks Operations, LLC v. Campbell*, 304 Va. 633, 645-46 (2025). Indeed, the General Assembly has already shown it knows how to give counties broad investigatory power to tax. For example, in Code § 58.1-3901 the General Assembly mandates that the owners of "apartment house[s]," "office building[s]," "shopping center[s]," "trailer camp[s]," "trailer court[s]" "marina[s]," "or privately owned or operated airport[s]" provide lists of their tenants to commissioners upon request. Code § 58.1-3901. Absent from this list are the owners of data centers. To the extent there is a gap in the County's investigative power over data centers, it is not our role to fill it. We have one role to play when interpreting a statute: we "administer the law as it is written." *Coalter v. Bargamin*, 99 Va. 65, 71 (1901).

Accordingly, we find that the County failed to comply with the statutory requirement by failing to "specifically identif[y] taxpayers." Code § 58.1-3110.

## II. Confidentiality provision and the carveout

In its final assignment of error, CoreSite contends that the circuit court misapplied the terms of the confidentiality provision in the customer agreement. CoreSite argues that the confidentiality provision bars it from releasing customer information without a court order. We disagree.

Interpreting a contract "presents a question of law subject to de novo review." *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 283 Va. 624, 633 (2012).

The threshold inquiry in interpreting the terms of a contract is to determine whether any of the terms are ambiguous. "Contract language is ambiguous when 'it may be understood in more than one way or when it refers to two or more things at the same time.'" *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 632 (2002) (quoting *Granite State Ins. Co. v. Bottoms*, 243 Va. 228, 234 (1992)). If the language of a contract is ambiguous, then courts "look to parol evidence in order to determine the intent of the parties." *Id.* If, however, the language of a contract is unambiguous, courts follow the "plain meaning" rule. *Amos v. Coffey*, 228 Va. 88, 92 (1984). Under this rule, the "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning." *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 392 (2012) (quoting *D.C. McClain, Inc. v. Arlington Cnty.*, 249 Va. 131, 135 (1995)). In a similar vein, "courts are not at liberty to add terms not included by the parties." *Quadros & Assocs., P.C. v. City of Hampton*, 268 Va. 50, 54 (2004) (citing *Amchem Prods., Inc. v. Newport News Cir. Ct. Asbestos Cases Plaintiffs*, 264 Va. 89, 98 (2002)). Indeed, this Court's "guiding light" in contract construction is that the parties' intention is expressed by words they have used, and "courts are bound to say that the parties intended what the written instrument plainly declares." *Amos*, 228 Va. at 92 (quoting *Magann Corp. v. Elec. Works*, 203 Va. 259, 264 (1962)). "Additionally, '[n]o word or clause in the contract will be treated as meaningless if a

reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.'" *Preferred Sys. Sols.*, 284 Va. at 392 (alteration in original) (quoting *D.C. McClain*, 249 Va. at 135-36).

In the contract term at issue, CoreSite agrees to keep the terms of the contract confidential—including customer names. The confidentiality provision, however, contains a carveout: CoreSite may provide "any information as required to any receiver or governmental or quasi-governmental entity, or to any person or entity with a valid court order."

Applying the established contract principles to the carveout in the confidentiality provision, there is no construction that supports CoreSite's interpretation requiring a court order to respond to a governmental request. First, the carveout is unambiguous on its face. Nothing in the carveout can be said to "be understood in more than one way" or "refer[] to two or more things at the same time." *Eure*, 263 Va. at 632. And second, a plain reading of the carveout's unambiguous language demonstrates that the carveout delineates two instances when CoreSite may disclose information: (1) governmental requests, and (2) non-governmental requests backed up with a court order. Under the plain language of the carveout, the County's status as a governmental entity requesting information is sufficient to allow CoreSite to provide the requested information.

A contrary reading, like the one CoreSite supports, would render half of the carveout meaningless because the enumerated list of "any receiver or governmental or quasi-governmental entity" would be completely absorbed by the broader designation, "any person or entity with a valid court order." The general rule—that courts give effect to every word if reasonable meaning is found—precludes CoreSite's interpretation. *Preferred Sys. Sols.*, 284 Va. at 392 (quoting *D.C. McClain*, 249 Va. at 135-36).

Therefore, under the plain language of the carveout in the parties' contract, CoreSite is not barred from providing information.[3]

CONCLUSION

The requirements in Code § 58.1-3109 are broad enough to encompass investigating CoreSite's customers because the statute requires that the County make a "complete assessment" of personal property. However, we also find the County failed to "specifically identif[y]" taxpayers, as required by Code § 58.1-3110, and on remand, the circuit court shall vacate any order enforcing the January 2024 summons. Nothing in this opinion prevents the County from seeking information from CoreSite through a new summons that complies with Code § 58.1-3110. Finally, the confidentiality provision in the customer agreement does not bar CoreSite from disclosing customer information because the provision contains a carveout for government requests. For these reasons, we affirm the circuit court's judgment in part, reverse it in part, and remand the case for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*

---

[3] Because the confidentiality provision allows CoreSite to comply with governmental requests there is no need to discuss CoreSite's arguments over whether a summons is "the law" or whether Code § 58.1-3 is an adequate safeguard for protecting confidentiality. Furthermore, we express no view on whether CoreSite may have duties arising from other sources of law.